IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VINEWOOD CAPITAL, L.L.C.          §
                                  §
VS.                               §   CIVIL ACTION NO.4:06-CV-316-Y
                                  §
DAR AL-MAAL AL-ISLAMI TRUST,      §
ET AL.                            §

ORDER DENYING DEFENDANTS' MOTION TO STAY OR DISMISS
(with special instructions for the clerk of Court)

Plaintiff Vinewood Capital, LLC ("Vinewood"), has filed suit against defendants Dar al-Maal al-Islami Trust ("the DMI Trust"), Ziad Rawashdeh, and Khalid Abdulla-Janahi for breach of contract, promissory estoppel, fraud, and negligent misrepresentation. Vinewood asserts that Defendants entered into an agreement with it or made promises to invest in certain real-estate ventures and that it suffered damages when Defendants failed to invest.

Defendants have filed a motion (doc. #42) to stay or dismiss this case. Defendants argue that Vinewood's claims all relate to or arise from two written agreements between the parties that contain binding arbitration clauses. Alternatively, Defendants argue that Vinewood's claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) and 9(b). Finally, should the Court rule against them, Defendants argue that Alpha Investment Fund I Limited should be joined as an indispensable party under Rule 19(a). After review, the Court concludes that Defendants' motion should be DENIED.

I.   Factual Background

In April 2004, Wendel Pardue and Laird Fairchild filed an action in Texas state court ("the Texas litigation") against their former employer, Overland Realty Capital LLC ("Overland"), and several of its subsidiaries, affiliates, and directors, including defendant Ziad Rawashdeh (collectively, "the Overland defendants"). Pardue and Fairchild alleged that the Overland defendants terminated their employment without cause and falsely told others that they were fired for committing fraud.  The Overland defendants filed counterclaims.

In June 2004, James Conrad, a former Overland employee, traveled to Geneva, Switzerland, and met with Rawashdeh and defendant Khalid Abdulla-Janahi to negotiate a settlement of the Texas litigation.[1]  At that meeting Pardue and Fairchild proposed an agreement to resolve all of their disputes.  (Defs.' Reply App. at 4.)   Under the proposal, Pardue, Fairchild, and Conrad ("the Trio") would create a new real-estate investment company called "Vinewood . . . for the purpose of sourcing real estate investments for" DMI Trust and its related entities ("the DMI Trust entities"). Vinewood "would be the exclusive company used by" these entities

---

[1]  Janahi was not a defendant in that case but was present at the settlement conference as a representative of the Islamic Investment Company of the Gulf (Bahamas)("IICGB"), one of the Overland defendants.  Conrad worked for Overland until his termination in March 2004.  Although Conrad was not a party to the Texas litigation, he claims that, because he had a relationship with the parties, the Overland defendants asked him to participate in the settlement negotiations.  (Pl.'s App. at 41-42.)  According to the Settlement Agreement discussed below, Conrad also had claims he intended to assert against the Overland defendants arising from his employment and termination at Overland.

for real-estate ventures in the United States, and it "would take over the Asset Management Agreements for real estate that was sourced by Overland while [Conrad] was employed [there]." (*Id.*) The DMI Trust entities would provide a 2.5 million dollar five-year loan to Vinewood as startup capital, and make a cash payment of almost 1.5 million dollars to Vinewood. (*Id.*)

Negotiations continued for several months and, on October 7, 2004, the parties signed a "Settlement Agreement and Release."[2] (Pl.'s App. at 29.)("The Settlement Agreement") The Settlement Agreement states that it is an agreement between the Trio on the one hand, and the Overland defendants on the other, to resolve all of their disputes stemming from the Trio's employment and termination by Overland. (Pl.'s App. at 29.) In the agreement, the Overland defendants agreed to pay the Trio 1.25 million dollars. (*Id.* at 30.) In exchange, the parties agreed to "fully, forever, irrevocably and unconditionally" release each other "from any and all claims . . . of every kind and nature and description whatsoever . . . from the beginning of time up to and including the date

---

[2] As mentioned in footnote 1 above, Conrad was not a party to the Texas litigation. The Settlement Agreement, however, recites,

> Conrad has asserted that he has claims against one or more of the [Overland defendants that] may be brought in arbitration pursuant to an employment agreement between him and [Overland] . . . and [Overland] likewise asserts that it has claims against . . . Conrad arising from that employment agreement . . . .

(*Id.*)

of this Agreement . . . ." (*Id.* at 31-32.) The Settlement

Agreement also contained the following provisions:

> 6. <u>Prior Agreements</u>. This Agreement contains
> and constitutes the entire understanding and
> agreement between the Parties hereto with
> respect to all matters relating to Plaintiffs'
> [meaning the Trio] employment with or termina-
> tion from any of the [Overland defendants] and
> the settlement of the complaint and other
> claims settled hereby. This Agreement also
> supercedes all previous oral and written
> negotiations, agreements, commitments, and
> writings in connection therewith, including
> the September 3, 2004, Memorandum of Under-
> standing executed among the parties.
>
> . . .
>
> 16. <u>Applicable Law; Resolution of Disputes</u>.
> This Agreement shall be governed by the laws
> of the State of New York, without regard to
> conflict of laws provisions. Each of the
> Parties agrees that any dispute or controversy
> arising out of or relating to any interpreta-
> tion, construction, performance, or breach of
> this Agreement shall be settled by arbitration
> to be held in the Commonwealth of the Bahamas,
> in accordance with the applicable rules of the
> American Arbitration Association . . . . The
> decision of the arbitrator shall be final,
> conclusive, and binding on the parties . . . .
>
> . . .
>
> 17. <u>Entire Agreement</u>. This Agreement con-
> tains and constitutes the entire understanding
> and agreement between the Parties hereto with
> respect to the subject matter thereof, and
> cancels all previous oral and written negotia-
> tions, agreements, commitments, and writings
> in connection therewith between and among all
> of the Parties to this Agreement . . . .

(*Id.* at 32-36.) Nowhere in the agreement does it mention the

creation of Vinewood, that Vinewood would be the exclusive company

used by the DMI Trust entities (or any of the defendants in this suit) for real-estate ventures in the United States, or that the DMI Trust entities would pay any cash or loan any money to Vinewood.

During the negotiations that culminated in the October 2004 Settlement Agreement, the Trio created Vinewood. Seven days after the parties executed the Settlement Agreement, Vinewood entered into an agreement with August Investment Fund I Limited ("August Investment") called the "Special Purpose Mudaraba Agreement."[3] Under the mudaraba agreement, August Investment agreed to loan Vinewood up to 2.5 million dollars. In the agreement are the following provisions:

> 8.2 Entire Agreement
>
> This Agreement embodies the entire agreement and understanding between the Mudarib [Vinewood Capital] and the Participant [August Investment] and supercedes all prior agreements and understandings between the Mudarib and the Participant relating to the subject matter thereof.
>
> . . .
>
> 8.12 Relationship
>
> This Agreement relates to the funding of Participation Tranches and shall in no way be construed as creating any other relationship. The relationship between the Mudarib and the

---

[3] A mudaraba agreement is an Islamic financing instrument extending credit for an annual fee rather than compounding interest. Evidently, under Islamic law, loaning money for riba (interest) is prohibited. *See* A.L.M. ABDUL GAFOOR, MUDARABA-BASED INVESTMENT AND FINANCE, http://www.islamicbanking.nl/article2.html#_ftnref1.

> Participant is and shall be that of a Partici-
> pant ("Rab Al Maal") and Mudarib in respect of
> a property interest and shall not be construed
> as a partnership or joint venture.
>
> . . .
>
> 8.14 Applicable Law and Dispute Resolution
>
> . . . [T]his Agreement shall be governed by
> the laws of the State of New York, without
> regard to conflicts of law provisions.  Each
> of the Mudarib and the Participant agrees that
> any dispute or controversy arising out of or
> relating to any interpretation, construction,
> performance, or breach of this Agreement shall
> be settled by arbitration to be held in the
> Commonwealth of the Bahamas, in accordance
> with the applicable rules of the American
> Arbitration Association . . . .  The decision
> of the arbitrator shall be final, conclusive,
> and binding on the parties . . . .

(Pl.'s App. at 15-18.)  Nowhere in the mudaraba agreement does it refer to the Settlement Agreement nor does it state that Vinewood would be the exclusive company used by the DMI Trust entities (or any of the defendants in this suit) for real-estate ventures in the United States.  August Investment subsequently transferred its interest in the mudaraba agreement, with Vinewood's consent, to Alpha Investment Fund I Limited ("Alpha Investment").

On May 2, 2006, Vinewood filed this suit against Defendants alleging claims for breach of contract, promissory estoppel, fraud and misrepresentation.  The main text of Vinewood's first amended complaint is devoid of any factual allegations.  It simply alleges the elements for each cause of action, and makes conclusory allegations such as: "Plaintiff and Defendants entered into various

6

agreements regarding business relationships," that "Defendants made representations to Plaintiff of promises of future performance . . . upon which Plaintiff relied to its detriment," and "Defendants fraudulently induced Plaintiff into entering into agreements based upon false representations upon which Plaintiff relied to its detriment." (Pl.'s Am. Compl. at 2.)

The first amended complaint, however, does refer to and incorporate two attached affidavits from Fairchild and Conrad. According to Fairchild, in October 2004, Vinewood entered into agreements with DMI Trust, through Rawashdeh and Janahi, to provide and manage certain real-estate ventures. (App. to Pl.'s Am. Comp. at 3.) He states that in December 2004 he went to London to meet with Janahi and other representatives of the DMI Trust to discuss real estate investment opportunities. Per their request, Fairchild claims, he and Conrad put together a business plan for approximately 125 million dollars worth of real-estate ventures and brought with them the chairman of Fairfield Residential LLC to discuss the investment opportunities. (*Id.*) Although he was asked not to participate in the meeting, Fairchild claims that afterwards, representatives of the DMI Trust told him that they were "going to invest in each of the Fairfield deals that were presented to them . . . ." (*Id.*)

In reliance on that representation, Fairchild states he "prepared a due diligence analysis, [conducted a] market study,

engaged in discussions with architects, review[ed] plans and specs, proposed pricing of units, and prepared a detailed investment summary." (*Id.* at 4.) Fairchild states that a representative of the DMI Trust told him that the DMI Trust "would transfer asset management responsibilities for the Fairfield related investments to Vinewood." (*Id.*) Relying on that representation, Fairchild claims Vinewood "began expending time recruiting employees and incorporated such into our business plan, including preparing budgets and other activities." (*Id.*)

Conrad's affidavit claims that in 2004, Vinewood entered into agreements with the DMI Trust, through Rawashdeh and Janahi, to provide and manage real-estate ventures. (*Id.* at 8.) Conrad states that in December 2004, he had a meeting in London with Janahi and other representatives of the DMI Trust, and claims that Janahi told him that if he "brought them the Fairfield business, [the DMI Trust] would fund the Fairfield business that [Vinewood] brought them." (*Id.*) He claims that prior to the meeting, "Rawashdeh called [him] from Pakistan and represented to [him] that [the DMI Trust] was moving forward to enter into the Fairfield business opportunities with Vinewood." (*Id.*) Relying on those representations, Conrad states that he and Fairchild put together a package of approximately 125 million dollars of real-estate ventures with Fairfield. (*Id.*) At the meeting, Conrad states they "reviewed the business opportunities, . . . Fairfield executives

presented detailed information concerning the investments, [and] . . . there was discussion about the specifics of the funding of the deals with [the DMI Trust]." (*Id.*)

Over the next twelve months, Conrad claims he met with representatives of the DMI Trust at various locations, including once with Janahi in New York in April 2006. (*Id.*) At one of these meetings, Conrad states Janahi introduced him to individuals from Bahrain and Kuwait who were doing business with the DMI Trust. (*Id.*) He alleges, "Janahi represented to me that we still intended to do business and that [the DMI Trust] still intended to fund the Fairfield deals as well as other deal [sic] that [Vinewood] brought them." (*Id.* at 8-9.) And during a breakfast meeting, Conrad claims "Janahi told [him] that they were getting the funds together and he wanted me to send him the Dulles and Addison deals." (*Id.* at 9.) He claims that in reliance upon those representations Vinewood "did a substantial amount of work putting together the business opportunities that were to be funded by [the DMI Trust]," only to have Defendants never followed through with their promises to invest.

II.  Analysis

    A.  Arbitration

    The Court begins its analysis by recognizing that there is a
strong and liberal policy favoring arbitration and the enforcement
of arbitration agreements that fall under the Federal Arbitration
Act ("FAA"), 9 U.S.C. § 3.[4]  *See Personal Security & Safety Systems
Inc. v. Motorola Inc.,* 297 F.3d 388, 391 (5th Cir. 2002).  Under
this general policy, "all doubts concerning the arbitrability of
claims should be resolved in favor of arbitration."  *Washington
Mutual Finance Group, LLC v. Bailey,* 364 F.3d 260, 263 (5th Cir.
2004).  "Of course this general policy is not without limits.
Because arbitration is necessarily a matter of contract, courts may
require a party to submit a dispute to arbitration only if the
party has expressly agreed to do so."  *Personal Security & Safety
Systems Inc.,* 297 F.3d at 391.  Thus, the first task of a court
asked to compel arbitration is to determine whether the parties
agreed to arbitrate the dispute.

    To ascertain whether the parties have agreed to arbitrate a
particular claim, the Court must first determine whether there is
a valid agreement to arbitrate between them.  *Id.* at 392.  If the
court concludes that the parties agreed to arbitrate, then the

---

    [4] Neither party argues that the arbitration clauses at issue here do not fall
under the FAA.

Court must determine whether the dispute in question falls within the scope of that arbitration agreement. *Id.*

### 1.   Valid Agreement

Vinewood argues that there is no valid arbitration agreement between it and the defendants.  The two agreements relied upon by Defendants——the Settlement and Mudaraba Agreements——are not agreements that are between Vinewood and Defendants, it argues. Vinewood contends that its claims involve an oral agreement that is separate and apart from those agreements.  (Pl.'s Resp. at 8.) Thus, Vinewood argues, "it would be inappropriate to force [it] to arbitrate its dispute against" Defendants when it never agreed to arbitration.  (*Id.*)

Defendants, on the other hand, argue that Vinewood "signed the mudaraba agreement, which contains a mandatory arbitration clause." (Defs.' Mem. at 6.)  Additionally, Defendants argue that Vinewood's principals, the Trio, signed the Settlement Agreement, which also contains an arbitration provision.  (*Id.*)  Thus, Defendants argue, the parties have a valid and enforceable agreement to arbitrate Vinewood's claims.  (*Id.*)

It is undisputed that Defendants are not parties to the mudaraba agreement as that agreement is a written contract between Vinewood and Alpha Investment.  It is also undisputed that Vinewood is not a party to the Settlement Agreement.  (*Id.* at 6, 8.)  The

Court agrees with Vinewood that none of these agreements evince an agreement to arbitrate between Vinewood and Defendants.

Although the Settlement Agreement is signed by Vinewood's principals, they did not sign the agreement as its representatives. Instead, the Trio signed the Settlement Agreement in their individual capacities agreeing to settle claims they owned——not claims Vinewood owned. And Vinewood does not benefit in any way from the Settlement Agreement.

Not one of the defendants is a party to the mudaraba agreement. That agreement is between Vinewood and Alpha Investment for a loan to be repaid under certain terms. Although Janahi signed the mudaraba agreement, he did so as a representative of August Investment, which subsequently transferred its interest in the agreement to Alpha Investment. Nothing in the mudaraba agreement creates any contractual relationship between Vinewood and Defendants.

Nevertheless, Defendants argue that Vinewood should be compelled to arbitration under the doctrine of equitable estoppel. Equitable estoppel can in fact, impose an exception upon the general rule that "a party cannot be required to submit to arbitration any dispute [that] he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). In *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir. 2000), the court of appeals adopted the view that

equitable estoppel would allow a nonsignatory to compel arbitration in two circumstances:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a nonsignatory. When each signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaning-less and the federal policy in favor of arbi-tration effectively thwarted.

The first basis requires a signatory's claim to completely rely on the terms of an agreement that contains an arbitration clause. The second basis is satisfied where a signatory makes claims against a group of defendants that is comprised of both signatories and nonsignatories to an agreement containing an arbitration clause.

The purpose of the equitable estoppel doctrine is to prevent a plaintiff from claiming the benefits of a contract while at the same time avoiding its burdens. *See Washington Mutual Finance Group, LLC,* 364 F.3d at 268. "In short, . . . a signatory . . . cannot, on the one hand, seek to hold the nonsignatory liable pursuant to the duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's

applicability because the defendant is a nonsignatory." *Grigson,*
210 F.3d at 528. "Restated, the doctrine of estoppel prevents a
party from having it both ways." *Washington Mutual Finance Group,*
*LLC,* 364 F.3d at 268.

Equitable estoppel cannot apply to the Settlement Agreement
because Vinewood is not a signatory to that agreement. Under both
bases for equitable estoppel, the party bringing the claim must be
a signatory to an agreement that contains an arbitration provision.
And, although Vinewood is a signatory to the mudaraba agreement,
equitable estoppel does not apply because Vinewood neither relies
on that agreement to support its claims nor has it brought claims
against a group of defendants that is comprised of both signatories
and nonsignatories to that agreement. None of the defendants have
signed or are in any way bound by the mudaraba agreement.

Defendants, nonetheless, argue that Vinewood should be
estopped because its claims "presume the existence of and rely upon
both the settlement and mudaraba agreements." (Defs.' Mem. at 11.)
Defendants accuse Vinewood of artfully pleading claims against
defendants who are nonsignatories to the mudaraba agreement, but
that since its claims presume the existence of that agreement and
relies upon it, Vinewood should be compelled to arbitration.

Throughout their brief, however, Vinewood concedes that it
cannot rely and does not rely on either of those agreements to
sustain its claims against Defendants. None of Vinewood's claims

relate to or arise from those agreements and, according to the express terms of those agreements, anything discussed, agreed to, or negotiated prior to the execution of those agreements that is not expressly included in those agreements is not binding on the parties to those agreements. The Settlement Agreement concerned the settlement of wrongful-termination claims for a definite sum. The mudaraba agreement concerned a loan Alpha Investment made to Vinewood and provides for certain terms under which Vinewood is obligated to repay that loan. "Indeed," Vinewood concedes, Alpha "met its obligation under the [mudaraba] agreement and there is no basis upon which to assert a claim against [it]." (Pl.'s Resp. at 11.) Neither agreement addresses nor requires the defendants to commit to or invest in any real-estate ventures brought to them by Vinewood.[5] Thus, the Court concludes that the parties have not entered into any agreement to arbitrate the claims brought by Vinewood.

---

[5] In contrast, IICGB has initiated an arbitration against Fairchild for allegedly breaching the confidentiality and non-disparagement provisions in the Settlement Agreement. Both IICGB and Fairchild are parties to that agreement and, in that agreement, the parties promised to keep the terms of the settlement and any and all negotiations and discussions leading up to the agreement confidential and to refrain from making any disparaging statements about each other. The arbitration provision in the agreement covers any breach of the agreement.

2.    Scope of the Agreement

Even assuming that the arbitration provisions in both agreements are binding on the parties in this case, Vinewood's claims do not arise out of, do not relate to, nor are connected with those agreements.  According to the provisions, the parties agreed to arbitrate "any dispute or controversy arising out of or relating to any interpretation, construction, performance, or breach" of the agreements.  (Pl.'s App. at 18, 35.)  "Both the Supreme Court and this court have characterized similar arbitration clauses as broad arbitration clauses capable of expansive reach." *Pennzoil Exploration and Production Company v. Ramco Energy Limited,* 139 F.3d 1061, 1067 (5th Cir. 1998).[6]  Arbitration provisions that not only use the phrase "arising out of," but also include "in connection with" or "relating to" are construed as broad arbitration agreements that are not limited to disputes arising directly from the contract, but cover "'all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute.'" *Personal Security & Safety Systems, Inc.,* 297 F.3d at 393 (quoting

---

[6]  The arbitration provision at issue in *Pennzoil* read:

> Any dispute, controversy or claim arising out of or in relation to or in connection with this Agreement or the operations carried out under this Agreement, including without limitation any dispute as to the validity, interpretation, enforceability or breach of this Agreement, shall be exclusively and finally settled by arbitration .
> . . .

136 F.3d at 1064.

16

*Pennzoil,* 139 F.3d at 1067). Thus, the Court must determine whether the claims in this case "touch" on matters covered by the settlement and mudaraba agreements and the central question is whether the Court "can say with positive assurance that the arbitration provision[s] . . . [are] not susceptible of an interpretation that would cover those claims." *Personal Security & Safety Systems, Inc.,* 297 F.3d at 392; *Pennzoil,* 139 F.3d at 1068.

Defendants' main argument is that the parties discussed the creation of Vinewood, its loan, and their future business relation-ship when they were negotiating the settlement of the Texas litigation. Defendants contend that Vinewood "seeks redress concerning representations allegedly made by Defendants and/or its representatives in the negotiations of the settlement of the [Texas litigation], which was effected by those two related agreements or in related discussions immediately thereafter." (Defs.' Mem. at 9.) Thus, Defendants argue, Vinewood's "very existence—as well as the funds by which it was capitalized, the reasons for that funding, and its present claims against its funders—all rise out of and relate to the settlement of the [Texas litigation]." (*Id.*)

Although the creation of Vinewood, its capitalization, and its business relationship with Defendants were discussed during the settlement negotiations, the ultimate settlement agreement did not provide for the creation of Vinewood and did not impose any duty on

17

Defendants to provide it with any loans or to invest in any real-estate ventures it brought to their attention.

Similarly, the mudaraba agreement provided for an entity that was not a party to the Texas litigation and is not a party to this litigation to loan Vinewood up to 2.5 million dollars. Nowhere does the mudaraba agreement refer to the Texas litigation; nowhere does it state it was made for the purposes of settling any litigation; and, it too fails to contain any provision requiring Defendants to invest in any real-estate ventures procured by Vinewood.

Vinewood's claims stem from an alleged agreement, promises, and representations that occurred after the Settlement and mudaraba agreements were made. Vinewood accordingly concedes that its claims cannot rely on them.

But just as Vinewood is unable to rely on the agreements to support its claims, Defendants are equally unable to rely on them as a defense because they have no bearing on Vinewood's claims. Whether Defendants agreed, promised, or represented that they would invest in certain real-estate ventures brought to them by Vinewood does not relate to, arise from, nor is in any way connected to the Overland defendants' agreement to pay the Trio in settlement of the Texas litigation and Alpha Investment's agreement to loan Vinewood up to 2.5 million dollars. And simply because Defendants may have discussed the possibility of a future business relationship during

settlement negotiations does not, *a fortiori,* mean any claims stemming from any alleged agreements, promises, or representations made after the Texas litigation settled relate to or are connected with that settlement——especially when the express wording of the settlement and mudaraba agreements do not touch on such matters. Thus, the Court concludes that Vinewood's claims do not have a significant relationship to or touch on matters covered by the settlement and mudaraba agreements.

    B.    Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) for a failure to state a claim "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)(internal quotations and citations omitted). The court must accept as true all well pleaded, non-conclusory allegations in the complaint, must liberally construe the complaint in favor of the plaintiff, and resolve all doubts in the plaintiff's favor. *See Kaiser Aluminum*, 677 F.2d at 1050; *Collins, et al. v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000). But conclusory allegations, unwarranted deductions of fact, or "legal conclusions masquerading as factual [allegations] will not suffice to prevent [the granting of] a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *see Spiller v. City of Texas City, Police Dept.*, 130 F.3d

162, 167 (5th Cir. 1997); *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974).  "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 930 (5th Cir. 1995).  A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt from the face of the plaintiff's pleadings that he cannot prove any set of facts in support of his claim that would entitle him to relief.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 592, 594 (5th Cir. 1991); *Kaiser Aluminum*, 677 F.2d at 1050.

> The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim.  Thus, the Court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 313 (5th Cir. 2002).  "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins,* 224 F.3d at 498; FED.R.CIV.P. 12(b)(6).


1.    Breach-of-Contract Claim

Defendants argue that Vinewood has failed to sufficiently plead the threshold issue of a valid contract.  Defendants complain

20

that "there are no allegations of a written contract, of certain or definite terms, or of mutual assent—not even an assertion of a formal offer, let alone an acceptance by any defendant." (Defs.' Mem. at 17.) Vinewood retorts that it is not required to plead the specifics of the contract, such as the date it was formed or the specific terms of the contract. Instead, Vinewood argues, it need only give Defendants fair notice of its breach-of-contract claim and the grounds upon which it rests. (Pl.'s Resp. at 15-16.)

"The elements of a breach-of-contract claim under Texas law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and, 4) damages to the plaintiff resulting from the breach." *Lewis v. Bank of America NA,* 343 F.3d 540, 545 (5th Cir. 2003). While Rule 8(a) does not require a plaintiff to plead these elements in detail and the official forms to the federal rules of civil procedure demonstrate that a valid contract complaint can be very brief, a complaint must, nonetheless, "describe the alleged terms of the contract in a sufficiently specific manner to give the defendant notice of the nature of the claim." *American Realty Trust, Inc. v. Travelers Casualty and Surety Company of America,* 362 F. Supp. 2d 744, 753 (N.D. Tex. 2005)(Godbey, J.).

Vinewood's first amended complaint only conclusorily claims that it had a valid oral contract with Defendants, that it performed under the terms of that oral contract, that Defendants

breached that contract, and that it suffered damages caused by Defendants's breach. Legal conclusions masquerading as factual allegations are insufficient to state a valid claim and certainly fail to provide Defendants with sufficient notice as to the nature of the breach-of-contract claim.

The two affidavits attached to Vinewood's complaint offer very little assistance. Fairchild's affidavit simply states that he and Conrad met with Defendants in London to discuss real-estate ventures for Defendants to invest in. He admits that he did not participate in that meeting, but says afterwards, unnamed representatives of the DMI Trust told him they were going to invest in the Fairfield real-estate ventures presented to them. Fairchild alleges no facts that this representation amounted to a contractual obligation to invest in the Fairfield real-estate ventures. And Fairchild fails to give any factual allegations outlining how much Defendants agreed to invest, under what terms Defendants agreed to invest, when Defendants were to tender their investment, and what Vinewood's obligations and consideration were under the oral contract. Fairchild's affidavit offers nothing more than an allegation that Defendants represented that they intended to invest in the Fairfield real-estate venture, not that they committed to doing so.

Conrad's affidavit states that Defendants allegedly told him if Vinewood brought them the Fairfield real-estate ventures, they

would invest in it. But then Conrad states he and Fairchild put together a presentation outlining 125 million dollars worth of Fairfield real-estate ventures and brought representatives of Fairfield to the meeting in London. If Defendants had already contractually committed to investing in the Fairfield ventures, then the presentation shouldn't have been necessary.

At the presentation, Conrad states that the parties discussed the real-estate ventures and discussed specifics regarding investments in the ventures. Conrad goes on to say that over the next twelve months, he had more discussions with Defendants, that he was introduced to other individuals already doing business with Defendants, and that Defendants told him they still intended to invest in the Fairfield ventures. He too, fails to give any specifics discussed at these meetings to show that the parties came to any agreement. On the contrary, his statements illustrate that the parties were locked in negotiations and discussions regarding potential investment in the Fairfield real-estate ventures and never came to any meeting of the minds. Of particular note, Conrad makes no factual allegation to show that Defendants had committed a definite sum to invest and agreed to invest rather than just represent that they intended to invest. And Conrad fails to allege any facts that establish what Vinewood's obligations and benefits

were under its alleged agreement with Defendants.[7]  Thus, the Court

concludes that Vinewood has failed to state a claim for breach of

contract.[8]

## 2. Promissory Estoppel

Defendants argue that Vinewood has filed to state a claim for

promissory estoppel because its complaint only shows that the

parties engaged in preliminary discussions regarding possible

investment in certain real-estate ventures.  Defendants contend,

"There were no promises by Defendants, and clearly there could not

be any substantial, foreseeable, and reasonable reliance by

[Vinewood]." (Defs.' Mem. at 18.)  Vinewood, naturally, disagrees,

and argues that it has stated a claim because its complaint pleads

"that Defendants made promises and that [Vinewood] relied on those

promises."  (Pl.'s Resp. at 17.)  Vinewood points out that in

Conrad's affidavit, he alleges that "Ziad Rawashdeh called me

[Conrad] from Pakistan and represented to me that [the DMI Trust]

---

[7]  In its first amended complaint, Vinewood alleges in boiler plate language
that the conduct of the parties evidences that they had a valid and binding contract.
An implied contract can arise "from the acts and conduct of the parties, it being
implied from the facts and circumstances that there was a mutual intention to
contract." *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.,*
480 S.W.2d 607, 609 (Tex. 1972).  In the present case, Vinewood fails to allege any
facts that show Defendants acted in any manner evidencing an intention to contract.
Simply attending meetings and discussing possible real-estate ventures for investment
and stating an intent to invest, without more, is insufficient to establish an
implied contract.

[8]  As will be discussed below, because Vinewood will be given an opportunity
to file a second amended complaint, the Court need not address at this time
Defendants' statute-of-frauds argument.

was moving forward to enter into the Fairfield business opportunities with Vinewood." (*Id.*)

To state a cause of action for promissory estoppel under Texas law, a plaintiff must plead sufficient facts showing: (1) a promise; (2) foreseeability of reliance thereon by the promisor; and, (3) substantial reliance by the promisee to his detriment. *Clardy Mfg. Co. v. Marine Midland Bus. Loans,* 88 F.3d 347, 360 (5th Cir. 1996). In addition, a plaintiff must show that injustice can be avoided only by enforcing the promise and a plaintiff must show that his reliance on the promise was reasonable or justified. *Id.*

Similarly to its exposition of its breach-of-contract claim, Vinewood's first amended complaint avers no more than the elements of promissory estoppel as its factual allegations. And the attached affidavits fail to show that Defendants made any specific promises——only that they expressed a desire to invest in certain real-estate ventures.

Even if, however, the Court were to liberally construe Defendants' statements as promises, Vinewood fails to allege any facts that show it was reasonable or justified for it to rely on those statements to its detriment. According to Vinewood, Defendants at best allegedly "promised" to invest, there is nothing to say how much they would invest, in which ventures it would invest, and when it would invest in the ventures. Any acts Vinewood took based on a very vague and general "promise" to invest

is just not reasonable or justified.  For example, Vinewood claims
that it hired additional employees in anticipation of Defendants'
investment in the Fairfield real-estate ventures, but without
knowing which ventures Defendants would invest in and how much they
would invest.  It is simply not reasonable to rely on an alleged
"promise" to invest when the details of the investment are unknown.
Thus, the Court concludes that Vinewood has failed to state a claim
for promissory estoppel.

### 3.  Fraud

Defendants argue that Vinewood's "allegations wholly fail to
satisfy the pleading requirements of a fraud claim." (Defs.' Mem.
at 19.)  In particular, Defendants contend that Vinewood's fraud
allegations fail to meet the heightened pleading requirements under
Rule 9(b) because Vinewood relies on general allegations that lump
all of the defendants together and fail to explain what was false
about any of the alleged representations, why they were fraudulent,
and what demonstrates that the defendants had any fraudulent
intent.  (*Id.* at 20.)

While Vinewood agrees that "allegations of fraud must be made
with sufficient particularity pursuant to [Rule 9]," it contends,
nonetheless, that "the affidavits of Fairchild and Conrad clarify
the specific individuals . . . that were responsible for making the
misrepresentations of which Vinewood complains and also lay out the

who, what, why, and where." (Pl.'s Resp. at 17-18.) Vinewood argues, thus, its allegation of fraud is sufficient under Rules 8 and 9 to give Defendants adequate notice. (*Id.*)

Under Rule 9(b), allegations of fraud must be stated with particularity. To satisfy the rule's heightened pleading standard, a plaintiff must specify the statements contended to be fraudulent, identify the speaker of the statements, state when and where the statements were made, and explain why they were fraudulent. *See Zuckerman v. Foxmeyer Health Corp.,* 4 F. Supp. 2d 618, 622 (N.D. Tex. 1998)(Maloney, J.). While Rule 9(b) allows allegations of intent to be averred generally, a mere allegation that a defendant had the intent to commit fraud is insufficient. *See Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994). A plaintiff "must set forth *specific facts* supporting an inference of fraud." *Id.* (emphasis in original).

Vinewood's complaint fails to specify which statements of Defendants set out in Fairchild's and Conrad's affidavits were fraudulent. Further, Fairchild states that in London "representa- tives" of the DMI Trust told him that they were going to invest in the Fairfield real-estate ventures, but he fails to identify who these "representatives" were.

Worse, even as to statements that are attributable to either Rawashdeh or Janahi, Vinewood fails to explain why they were fraudulent. Vinewood's complaint simply conclusorily alleges that

Defendants made oral promises "with no intention to perform such promises." (Pl.'s Am. Compl. at 3.) Vinewood offers no basis to support fraudulent intent other than the obvious fact that Defendants failed to invest in the Fairfield real-estate ventures. "Generally, there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed." *Willard v. Humana Health Plan of Texas, Inc.,* 336 F.3d 375, 386 (5th Cir. 2003); *see also Fluorine on Call Ltd. v. Fluorogas Ltd.,* 380 F.3d 849, 858-59 (5th Cir. 2004)("Failure to perform a contract . . . is not evidence of fraud."). Even assuming Rawashdeh's and Janahi's statements were promises to invest, Vinewood fails to allege any facts that would support an inference that, at the time they made those statements, they were anything but genuine.

Moreover, this Court is unwilling to infer, from generalized and vague representations of an intent to invest in a real-estate venture, a promise or a commitment to invest. Absent good-faith allegations that Defendants made specific promises to invest, indicated which ventures they agreed to invest in, and stated the amounts of their promised investment, the Court cannot find a claim of fraud under Rule 9(b).

4.  Negligent Misrepresentation

A claim of negligent misrepresentation under Texas law contemplates a defendant's providing a misstatement of existing fact  to a plaintiff in the course of business or in a transaction in which the defendant has a pecuniary interest. *See Clardy Mfg. Co.,* 88 F.3d at 357.  "Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event." *Id.* (internal quotations and citations omitted).  Here, Vinewood alleges that Defendants represented or stated that they intended to invest in real-estate ventures through Fairfield. While those may have been statements of intent and not a guess, they lacked any substance to constitute a misstatement of fact. Vinewood does not allege that Defendants indicated which real-estate ventures they would invest in, how much they would invest, and when they would make the investment.  Moreover, Defendants' alleged statements were, at best, of future performance or an intent to invest in the future and not a statement of "existing" fact. *See Alpha Road v. NCNB Texas National Bank,* 879 F. Supp. 655 (N.D. Tex. 1995)(Fitzwater, J.)(holding bank officer's assurance that loan was a "done deal" referred to future performance and not actionable under theory of negligent misrepresentation)(followed in *Clardy Mfg. Co.,* 88 F.3d at 357).  Thus, the Court concludes that Vinewood fails to state a claim for negligent misrepresentation.

5.  Claims Based on Statements Made Prior to the Settlement and Mudaraba Agreements

Defendants argue that to the extent Vinewood's claims rest on statements or representations made by Defendants prior to the settlement and mudaraba agreements, those claims are precluded by the merger clauses contained in those agreements.  Vinewood's complaint, however, does not rest on alleged statements, promises, or representations made prior to the agreements.  At best, Fairchild's affidavit states that in October 2004, he became a shareholder in Vinewood and entered into an agreement with Defendants to provide and manage real-estate ventures.  He does not state when in October the alleged agreement was made.  The remainder of his affidavit details a meeting he and Conrad had with Defendants in London in December 2004.

Conrad's affidavit, on the other hand, makes no mention of any agreement or statements in October 2004, but details statements and discussions that occurred from December 2004 through April 2006.  In its response to Defendants' motion to stay or dismiss, Vinewood concedes that its claims do not rely on the agreements or any representations made prior to those agreements.  (See Pl.'s Resp. at 20.)("It does not, however, preclude Vinewood from suing nonsignatories for breaching other contracts that were entered into **months after the mudaraba agreement was signed.**")(Emphasis added.) As will be discussed below, the Court will permit Vinewood one final opportunity to file an amended complaint to meet its pleading

requirements.  To the extent that Vinewood files a second amended complaint that relies on any statements made prior to the settle-ment or mudaraba agreements, the Court reserves the right to revisit whether, in light of both agreements' merger provisions and provisions addressing any prior discussions, negotiations, or understandings, the parties should not be compelled to arbitration.

III. Conclusion

In light of the foregoing, the Court concludes that the parties have not entered into any agreement to arbitrate Vinewood's claims.  Even assuming the arbitration provisions in the settlement and mudaraba agreements are enforceable against the parties, the Court concludes that Vinewood's claims do not arise from or relate to those agreements.  Further, the Court concludes that Vinewood has failed to state a cause of action for breach of contract, promissory estoppel, fraud, and negligent misrepresentation. Although the Court may dismiss Vinewood's first amended complaint, "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."  *See Hart v. Bayer Corp.,* 199 F.3d 239, 248 n.6 (5th Cir. 2000).  Since Vinewood's defects are its failure to plead with the requisite particularity, the Court does not find them to be incurable.  The courts in this district prefer to decide cases on

their merits rather than on their pleadings and, therefore, the Court concludes that it is appropriate to give Vinewood one final opportunity to file an amended complaint. Finally, because the Court concludes that Vinewood's claims do not arise from or are not related to the mudaraba agreement, the Court concludes that Alpha Investment should not be joined to this litigation as an indispensable party under Rule 19. None of Vinewood's claims involve Alpha Investment.

Accordingly, Defendants' motion to stay or dismiss this case is DENIED, and the Court's stay of this case pending its decision of this motion is lifted. The clerk of Court is DIRECTED to remove the stay notation from the Court's docket. Vinewood shall have thirty days from the date of this order to file an amended complaint. Failure to do so will result in the dismissal of this case without further notice.

SIGNED September 26, 2007.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE